UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHARMAINE LEWIS, )
)
Plaintiff, )
v. ) Cause No. 21-cv-00181
)
NATIONAL BOARD OF OSTEOPATHIC, )
MEDICAL EXAMINERS, INC., )
)
Defendant. )

### DECLARATION OF JOSEPH E. BERNIER. Ph.D.

I, Joseph E. Bernier, Ph.D., based upon my personal knowledge, declare:

1. I am a licensed psychologist with an independent practice in consulting and clinical psychology. A copy of my current Curriculum Vita is attached to this Declaration.

2. I provide consulting services for the National Board of Osteopathic Medical Examiners, Inc. (NBOME) to assist the NBOME in its decisions making in regards to candidates' requests for accommodations under the Americans with Disabilities Act (ADA).

3. I am knowledgeable about the provisions of the ADA and the requirements for osteopathic medical students and graduates requesting accommodations under the ADA, about the COMLEX-USA examinations provided by the NBOME, and the appropriateness of accommodations for the administration of those examinations requested by candidates.

4. In 2017 the NBOME requested me to review the application of Sharmaine Lewis for accommodations for time and one-half and a separate room for the COMLEX-USA Level 1 examination. On or about March 31, 2017, after careful review and consideration of the documents provided to me, I submitted to NBOME my Test Accommodation Review of Ms. Lewis' request for accommodations, which is attached to this Declaration (JB 0001-JB 0007).

5. In 2019 the NBOME requested me to review the application of Ms. Lewis for accommodations for fifty percent additional time and a separate room when she retakes the COMLEX-USA Level 2-CE examination. On or about February 19, 2019, after careful review and consideration of the documentation provided to me, I submitted to the NBOME my Test Accommodation Review of Ms. Lewis' request for accommodations, which is also attached to this Declaration (JB 0039-JB 0044).

6. Both Test Accommodations Reviews accurately reflected my opinions and recommendations to the NBOME regarding Ms. Lewis' requests for testing accommodations.

7. It is my opinion, based upon my education, knowledge and expertise, and the documentation provided to me regarding Ms. Lewis' requests for testing accommodations, that she is not substantially limited in her ability to access the COMLEX-USA Level 1 and Level 2-CE examinations as compared to most people in the general population, as required by the ADA.

I declare under penalty of perjury that the foregoing is true and correct.

Date: April 27, 2021.

                                                   /s/ Joseph E. Bernier, Ph.D.
                                                   Joseph E. Bernier, Ph.D.

# Joseph E. Bernier, Ph.D.
Curriculum Vita
Abbreviated

### Present Primary Employment

Independent practice, consulting and clinical psychology (1978-present). 5 Pine West Plaza, Suite 598, Washington Avenue Extension, Albany, New York 12205 (518-452-4232, ext. 2)

(Provision of diagnostic psychological evaluations to individuals. Provide disability-related consulting services to organizations. Established client organizations include universities, professional licensing and trade certification boards, and other standardized testing entities.)

### Education

| | |
|---|---|
| Highest Degree Earned: Ph.D. | Date of Degree: August 1976 |
| Institution/Program Name: | University of Minnesota/Educational Psychology |
| Area of Degree: Counseling Psychology | APA Accredited: Yes |
| Psychology Internship Completed: Yes | Year: 1975-1976 |

### Psychology Licensure and Certification

Psychology Licensure: Yes     State: New York     Year: 1978 - present

*National Register of Health Service Psychologists*: Yes     Year: 1983 – present

### Professional Memberships

Member, American Psychological Association

### Selected Publications

Flanagan, D., Keiser, S., Bernier, Joseph E., and Ortiz, S. *Diagnosis of Learning Disability in Adulthood*, Boston, Allyn and Bacon (2003).

Rivero, E. M., Cimini, M. D., Bernier, J. E., Stanley, J. A., Murray, A. D., Anderson, D. A., & Wright, H. R. (2014). Implementing an early intervention program for residential students who present with suicide risk: a case study. *Journal of American College Health*, 62(4), 285-291.

Cimini, M. D., Rivero, E. M., Bernier, J. E., Stanley, J. A., Murray, A. D., Anderson, D. A., Wright, H.W., & Bapat, M. (2014). Implementing an audience-specific small-group gatekeeper training

1

program to respond to suicide risk among college students: A case study. <u>Journal of American College Health</u>, 62(2), 92-100.

Other Professional Activities

Consultative Examiner, NYS Office of Temporary and Disability Assistance/Division of Disability Determinations (2000 - Present).

Past Primary Professional Employment

(1) Clinical/Counseling Psychologist and Director for Doctoral Internship Training & Clinical Assessment, Counseling and Psychological Services/University at Albany, 400 Patroon Creek Blvd., Suite 104, Albany, New York 12206 (<u>tenured</u>) (1991-2018)

(2) Instructor, Department of Counseling Psychology, University at Albany, Albany, NY (2001, 2007, 2008)

(3) Clinical/Counseling Psychologist, Four Winds Hospital, Saratoga Springs, New York (1988-1991)

(4) Clinical/Counseling Psychologist & Director, Psychological Counseling Center, Siena College, Loudonville, New York (1987-1988).

(5) Clinical/Counseling Psychologist & Director, Psychological Counseling Service, the College of St. Rose, Albany, New York (1980-1987)

(6) Assistant Professor, Department of Counseling Psychology and Student Development, State University of New York at Albany, Albany, New York (1976-1980)

References

References furnished upon request.

2021

Test Accommodation Review

March 31, 2017

Re: Sharmaine Lewis (512157)

This is a review of a request for time and one-half and a separate room on the Comprehensive Osteopathic Medical Licensing Examination (Level 1). The applicant, Sharmaine Lewis, states that a specific reading disorder and an anxiety disorder impair her functioning, specifically by affecting the major life activities of reading, learning, and concentrating[1]. She explains that it takes her more time to process information.

I have reviewed Ms. Lewis' request within the framework of the Americans with Disabilities Act as Amended. In order to qualify for an accommodation under the law Ms. Lewis must demonstrate with credible and objective evidence the presence of a substantially limiting impairment and, if so demonstrated, that any accommodation she requests is needed to make the examination accessible, provided that it does not fundamentally alter what the examination is intended to measure or is unduly burdensome.

Review

A. Impairment

Ms. Lewis presents a rather complex case. Whether or not she presents a learning disorder specific to reading is questionable. She presents nothing to substantiate significant delays or other abnormalities learning to read during childhood, as are important for accurate diagnosis. Regardless of the fact that she was first diagnosed nearly seven years ago, while attending graduate school, she presents no credible and objective evidence of significant reading problems during childhood. Moreover Ms. Lewis presented limited evidence from individualized assessments to show that her reading abilities are substantially and quantifiably below those of others at her age[2]. This is illustrated in the charts below regarding reading achievement test scores.

---

[1] Lewis 01-20-2017
[2] Smothers & Wintermyer 06-14-2010; Dumitrascu 06-30-2015

Standard Scores from Woodcock Johnson-III Reading Achievement Tests[3]

| Reading Tests | 2010 | 2015 |
|---|---|---|
| Word Attack | Not given | 91 |
| Word Reading | 91 | 94 |
| Passage Comprehension | 95 | 98 |
| Reading Fluency (Sentences) | 66 | 85 |
| Spelling | 106 | 109 |

On the Woodcock Johnson, standard scores that fall between 85 and 115 are within the average range (defined under the bell curve as the middle sixty-eight percent of the population). Here only one of the diagnostic reading subtests falls outside and below that range (i.e., reading fluency in 2010). The remainder are within average or normal limits. There is consistency in performance between the two assessments overall.

Scaled Scores from the Nelson Denny Reading Test[4]

| Reading Test | 2010 | 2015 |
|---|---|---|
| Reading Vocabulary | 214 | Not given |
| Passage Comprehension | 213 | 216 |
| Reading Rate (1 minute test) | 180 | 183 |

The average range for scaled scores on the NDRT covers scores between 175 and 225 scaled score points. The scaled scores are a marker of reading abilities when compared to the general population represented by individuals in grades ten through fourteen (second year in college). Other than reading rate, which is determined by a single one-minute sample of reading, vocabulary and comprehension are measured using timed, multiple-choice tests.

Clearly all of the Nelson Denny scores are within the average range. As above, one sees some consistency in performance over the years. In fact, when compared to individuals completing their first year of college (not shown in the chart), all but one of the subtests is within average limits. The singular exception is the one-minute reading rate in 2010. Based upon the NDRT scores, reading per se should not present as an impediment to accessing the licensing examination. This is best exemplified by the time multiple-choice passage comprehension subtest findings.

---

[3] Smothers & Wintermyer 06-14-2010; Dumitrascu 06-30-2015
[4] Smothers & Wintermyer 06-14-2010; Dumitrascu 06-30-2015

The absence of credible and objective evidence of significant childhood reading difficulties, coupled with the largely average reading test scores during adulthood obtained through individualized evaluations, create serious doubts about the specific reading disorder diagnosis.

As I noted, this is a complex case. The complexity arises when one examines the entire data set generated in the two psychological evaluations. I see a pattern here in the intelligence testing (and other cognitive tests) that is evident in both assessments[5]. Specifically, it appears that Ms. Lewis is more capable of solving problems that are based upon retrieval of previously acquired information, than she is when problem-solving depends upon the manipulation of working memory and quick thinking. This pattern apparent in the intelligence testing is consistent with many of the other cognitive test findings. I think that this is what her evaluators have erroneously formulated as a reading disability. References to information processing inefficiencies repeatedly appear throughout the evaluation reports.

Composite Scores (Percentiles) on the Wechsler Adult Intelligence Test-IV

| Composite Score Percentiles | 2010 | 2015* |
| --- | --- | --- |
| Verbal Comprehension | 68% | 84% |
| Perceptual Reasoning | 30% | 25% |
| Working Memory | 37% | 31% |
| Speed | 10% | 16% |

* These percentile scores (2015) are estimated based on converting the scaled score average for the subtests that make up each specific composite. This type of analysis was required (on my part) because the examiners elected to not provide a full set of composite scores because of variability among the subtests.

This chart puts numbers to the above narrative. Verbal comprehension has been regarded as a marker of the ability to solve problems that require the retrieval of previously acquired information. Perceptual reasoning has been regarded as a marker of the ability to fluently solve problems that place no real demands upon requisite knowledge, but instead require the manipulation of working memory. The two other composites are markers of cognitive efficiency in a context that does not also require complex thinking or problem solving[6]. There was a good bit of scatter or unevenness in performance among the subtests that go into the perceptual, memory, and speed composites. In the data set one sees an increase in verbal knowledge

---

[5] Smothers & Wintermyer 06-14-2010; Dumitrascu 06-30-2015

[6] One could reasonably argue that cognitive efficiency within the context of problem solving is of greater relevant to what is required when taking examinations than are stripped down measures of working memory and speed.

and its use and a decrease in fluid problem solving and working memory proper over five years. But what strikes me as most noteworthy is the disparity between the crystallized (verbal) and fluid (nonverbal) reasoning abilities.

Within the reports there is a good deal of information that suggests another possible formulation of what appear to be genuine complaints expressed by the applicant. In my opinion there are some problems in information processing here that arguably could be diagnosed as a (non-specific) learning disorder. Beyond the cognitive performance tests, there is additional indication of slow and laborious mental processing in the excessively long time it took her to complete various inventories and other untimed tests. Observational comments such as *"She was notably slow across tests and it took her a long time to complete* tasks"[7] and *"…she took three hours to complete each measure;* [whereas] *each of these tests generally take an hour and a half to complete*"[8] occur throughout the evaluation reports. These clinical observations provide valuable evidence of learning impairment beyond test scores alone. In acknowledging the possibility of a learning impairment of some sort, I am providing Ms. Lewis with some benefit of the doubt.

Ms. Lewis carries an anxiety disorder diagnosis as well[9]. It appears however that her anxiousness and panicky responding is specifically tied to academic performance, particularly taking tests. However, taking exams is not a major life activity and test anxiety in itself has not been regarded as a disability or a basis for providing accommodations. Based upon the narratives, it appears that Ms. Lewis anxiously suffers under the weight of her own high expectations and standards, which alone is not a mental disorder.

B. Disabled Functioning

It appears that certain academic institutions and testing organizations have recognized Ms. Lewis as a disabled individual. She is afforded time and one-half on tests and a separate room at West Virginia School of Osteopathic Medicine, citing her individualized psychological evaluation as supporting

---

[7] Dumitrascu 06-30-2015
[8] Smothers & Wintermyer 06-14-2010
[9] Domenico 03-09-2017; Quick 02-24-2017; Smothers & Wintermyer 06-14-2010; Dumitrascu 06-30-2015

accommodation[10]. There is some independent indication that she received time and one-half and a quiet room for examinations when a graduate student at Tufts University[11]. Ms. Lewis was afforded twenty-five percent additional time and a private room for the Medical College Admissions Test (2012, 2013)[12]. She received a similar accommodation for the Optometry Admissions Test (2011)[13]. The accommodations provided by the two testing entities were approved before she was last examined in 2015. One could reasonably question the decision to provide accommodations in light of the larger history and clinical examination findings (much of which has already been discussed), but the fact is that other entities have recognized Ms. Lewis as a disabled individual, a finding that warrants some weight.

On the other hand, it appears that Ms. Lewis managed to complete her education through college without any formal accommodation plan and graduated from Tufts University with an undergraduate grade point average of 3.2. One of her examiners noted that prior to college, "*...there was never a suspicion of a learning disorder or attention deficit hyperactivity disorder from her teachers or parents*"[14]. As near as I can tell Ms. Lewis has never had any formal accommodation plan in the workplace. According to one examiner, "*She denied any difficulties with speed, efficiency, or cognitive processing while at work, though she did note that she dreaded evaluations*"[15].

The chart below summarizes the accommodation history. It shows that while some entities have decided (for whatever reason) that Ms. Lewis is disabled, she managed to perform reasonably well without formal accommodations through college and in the workplace, bringing the notion that she is a substantially limited individual into some question.

| Without Accommodations Plan | With Accommodations Plan |
| --- | --- |
| 1. Elementary and secondary school | 1. Tufts University (graduate school, 3.0 GPA) |
| 2. College admissions tests (scores not given) | 2. OAT (2011, 1.5 time, separate room) |
| 3. Tufts University (undergraduate, 3.2 GPA) | 3. MCAT (2012-13, 1.25 time, separate room) |
| 4. Employment settings | 4. WVSOM (2016, 1.5 time, separate room) |

---

[10] Bridges 11-16-2016
[11] See Lapuz 08-10-2011
[12] MCAT Accommodations Services 02-17-2017
[13] Lapuz 08-10-2011
[14] Smothers & Wintermyer 06-14-2010
[15] Smothers & Wintermyer 06-14-2010

While the claim is that Ms. Lewis has benefited throughout her life from the indulgences of teachers and faculty and has worked hard and long, there is nothing within the file from independent third party sources to substantiate what informal accommodations she may have enjoyed.

So here one sees that Ms. Lewis has a possible cognitive or learning impairment, though not the one she was diagnosed with, and a history of being recognized, accurate or not, as a disabled person by post graduate programs and testing organizations. But there is also evidence in the history that her processing impairment has not substantially limited her ability to engage in daily activities in academic and employment settings -at least not prior to undertaking graduate education- or warranted an accommodations plan. In short, the picture on whether or not Ms. Lewis is a substantially limited individual relative to most people because of a learning impairment is a mixed picture.

C. Reasonable Accommodation

If one assumes for further discussion that Ms. Lewis is a disabled individual[16], the follow-up question would be whether the National Board of Osteopathic Medical Examiners is obligated to provide her with test accommodations or the specific accommodations she seeks.

As discussed above, I aver that Ms. Lewis has not factually established that accommodation is needed on the basis of a reading disability. She simply has not demonstrated that she suffers from a reading disability. Moreover, test anxiety is not a basis for accommodation. But what I regard as more complex is whether or not a longer examination is needed to mitigate the information processing inefficiencies I discussed above. There is a real question in my mind whether the National Board of Osteopathic Medical Examiners is obliged to provide an accommodation for these information processing inefficiencies (as described in the evaluation reports and discussed here), considering that the licensing examination clearly and specifically intends to measure a person's ability to process and apply clinical knowledge in a <u>fluid or fluent</u> manner, which NBOME regards as fundamental to competent clinical practice[17]. This is a matter that the

---

[16] In so doing, I am giving the applicant the benefit of the doubt.
[17] From the NBOME website: "Each of the COMLEX-USA examinations is administered in a standardized, time-measured environment, as the ability to interpret, process and apply clinical knowledge

NBOME Test Accommodations Committee must consider in their deliberations about this application.

Conclusion

The documentation does not support the contention that Ms. Lewis has a reading disorder. She however may have a disorder in her information processing capacities. The evidence is mixed regarding whether she is substantially limited in her functioning in everyday settings because of processing inefficiencies. It is important to note that AAMC provided Ms. Lewis with accommodations. But, if one gives the applicant the benefit of the doubt as to classification as a disabled individual, the downstream question is whether the NBOME has an obligation to provide Ms. Lewis with additional test time on the basis of slowed processing when the licensing examination is specifically intended to measure fluency in applying scientific and clinical knowledge. The very nature of her cognitive difficulties speaks to an ability that the examination intends to measure. The determination of whether additional time would undermine the validity of the examination is a decision involving judgments on the part of the Test Accommodations Committee.

Joseph E. Bernier, Ph.D.
Licensed Psychologist

---

and skills with knowledge fluency and in a fluid manner is fundamental to a generalist osteopathic physician's competence to practice osteopathic medicine."

<u>Test Accommodations Review</u>
February 19, 2019

Re: Sharmaine A. Lewis (512157)

Sharmaine Lewis is requesting fifty percent additional test time and a separate room when she retakes the written Comprehensive Osteopathic Medical Licensing Examination (Level 2-CE). She indicates that her ability to take the examination is impaired by a learning disorder affecting her reading abilities.

I have been asked to review the file and provide my professional recommendation on Ms. Lewis' request. I reviewed the following documents relating to her current request for accommodated testing.

Request for Test Accommodations Application & Personal Statement – Lewis, 2019
Psychological Evaluation – Smothers & Wintermyer, 2010 (edited 2012)
Psychological Evaluation – Dumitrascu, 2015
COM Verification of Accommodations – Pepper, 2019
Standardized Test Scores – MCAT, 2006-2013 (seven administrations)
Verification of MCAT Accommodations – Whiteman, 2013 (for 2013 administration)
Standardized Test Scores – SAT Program, 1999
Standardized Test Scores – College Board Advanced Placement Program, 2000
Standardized Test Scores – ACT, 2000
Academic Transcript – Jamaica (NY) High School, 1996-2000[1]
Verification of Accommodations (Optometry Admissions Test) – Androvel, 2011
NBOME COMLEX-L1 Decision Letter – Wong, 2017
Independent Consultant Review – Bernier, 2017

Ms. Lewis fundamentally contends that the laborious manner in which she reads and processes information consumes an inordinate amount of time and therefore requires test accommodation. She attributes her difficulties to a learning disorder in reading.

As stated in my review of her initial request for accommodations, whether or not she presents a learning disorder specific to reading is questionable. Ms. Lewis demonstrates a diverse set of cognitive and academic abilities within the general

---

[1] The high school transcript is the only new substantive information provided to support her request.

1

context of average intelligence. And although she might not fully meet criteria for a specific reading disorder diagnosis, her documentation provides some evidence of processing inefficiencies[2].

I further indicated in my initial review that there was mixed evidence of functional disability. Based on the records provided, it would appear that Ms. Lewis was able to maintain adequate independent functioning in academic settings through college (albeit perhaps with some effort as she claims), but ran into significant difficulties in her postgraduate studies[3]. Thereupon she was afforded additional time and a separate room in which to take her course examinations and on certain standardized examinations[4]. Reportedly Ms. Lewis has never had a formal accommodations plan in the workplace and according to her examiners, *"She denied any difficulties with speed, efficiency or cognitive processing while at work thanks to having sufficient amount of time to complete her tasks"* (Smothers & Wintermyer, 2010).

As I see it, the critical issue for the present review is whether Ms. Lewis' request for fifty percent more time and a separate room is warranted based upon the nature and degree of her current functional limitations as objectively demonstrated and relevant to accessing the examination. It is important to keep in mind that the COMLEX examinations are designed to assess osteopathic medical knowledge, *knowledge fluency*, clinical skills, and other competencies essential for general osteopathic medical practice. The COMLEX Level 2-CE examination evaluates the ability to apply osteopathic medical knowledge and concepts related to clinical sciences, patient presentations and physician tasks[5].

Upon review of the application documents, I believe that the records submitted do not provide sufficient objective evidence of functional impairment or limitation in the types of activities needed to access the written examination relative to the general population. Previously I concluded that Ms. Lewis had not established the

---

[2] Many such individuals are now diagnosed with Other (or Unspecified) Neurodevelopmental Disorder.

[3] Her high school transcript shows course averages in the eighties and nineties and she graduated from Tufts University with a 3.2 GPA. She took a leave of absence from her master's degree program specifically because of test anxiety.

[4] She was provided test accommodations on the Optometry Admissions Test (2011), the Medical College Admissions Test (2013), and currently in her medical school.

[5] Ms. Lewis passed the Level 1 examination on her first attempt and without accommodation. She failed the Level 2-CE examination on her first attempt (without accommodations).

2

fact that accommodation is needed on the basis of reading dysfunction. The data she provided has not changed, nor has my opinion on this[6].

Both psychological evaluations reviewed (and referenced above) assessed reading using the Woodcock Johnson-III and the Nelson Denny Reading Test. The objective testing results are presented in the tables below.

Woodcock Johnson-III Reading Achievement Tests (Standard Scores)

| WJ-III Reading Tests | 2010 | 2015 |
| --- | --- | --- |
| Word Attack | Not given | 91 |
| Word Reading | 91 | 94 |
| Spelling | 106 | 109 |
| Passage Comprehension | 95 | 98 |
| Reading Fluency (Sentences) | 66 | 85 |

Standard scores that fall between the 85 and 115 are within the average range. Score that are below 78 reflect impaired function. Only one of the diagnostic reading test scores is outside and below that range and in fact is in the impaired range. The others are within normal limits or average. The abnormality was on a reading fluency measure nine years ago, which improved on follow-up evaluation. All of the most recent WJ-III reading test scores are within average limits. The consistency in WJ-III reading achievement test findings between the two evaluations is also noteworthy.

Nelson Denny Reading Test Scaled Scores (standard timed administration)

| Reading Test | 2010 | 2015 |
| --- | --- | --- |
| Reading Vocabulary | 214 | Not given |
| Passage Comprehension | 213 | 216 |
| Reading Rate (1 minute test) | 180 | 183 |

The mean scaled score on the NDRT is 200 with a standard deviation of 25 points. This means that the average range for scaled scores are scores from 175 to 225. The *scaled scores* are a marker of reading abilities when compared to the general population of readers, defined by high school and lower division college students. Vocabulary and Comprehension are measured using timed, multiple-choice tests. Reading rate is based on a single, minute-long sample of reading without any consideration of accuracy. All of the reading scores are in the average range when

---

[6] See Bernier, 2017

3

compared to the general population of readers[7]. Ms. Lewis performed in the third quartile on timed, multiple-choice tests of reading function. The Nelson Denny in particular reflects reading proficiency in the context of a timed, multiple-choice examination that does not require prior content knowledge.

The take away message here is that with one exception, the scores from the WJ-III and NDRT do not indicate impairment in reading function, including when this is measured within the context of a multiple-choice examination[8].

The standardized testing history is also informative. The records provided show that Ms. Lewis scored in the average range on her college admissions tests. These examinations were completed without accommodation to use her claimed compensatory strategies.

ACT (2000) National Percentile scores

| English | Mathematics | Reading | Science Reasoning | Composite Score |
|---|---|---|---|---|
| 37 | 66 | 40 | 15 | 40 |

SAT (1999) National Percentile scores

| Verbal | Math |
|---|---|
| 43 | 49 |

These admissions tests provide comparison with the general population of high school students interested in college admission. The results presented here show diverse but largely average abilities consistent with the later findings from clinical measures of general intelligence. They would also predict that high achievement in college classes (which one sees in this case) would require greater effort and adaptive strategies. These entrance examination findings are not consistent with the notion of significant limitations in reading or processing or other abilities needed to access timed, standardized examinations.

---

[7] The psychologists who have examined the applicant build their analysis and discussion on percentile scores which compare the examinee with others in the same grade, not the general population. They treated the grade-based percentile scores as if they were age-based and erroneously made comparisons with other test scores that are age-based. The result is misleading and obscures the fact that the scaled score results indicate average reading proficiency (accuracy and speed together) when measured within a multiple-choice examination format.

[8] Impairment is customarily defined as scores that are above or below 1.5 standard deviations of the mean score. Only one score within these tables falls more than -1.5 sd (reading fluency, 2010).

4

Ms. Lewis later took the Medical College Admissions Test seven times. Her seventh effort was with time and one-quarter and a separate room. The scores reflect her standing among her college educated peers applying to medical school (not the average person in the general population). The MCAT Score Report shows that over the seven administrations, eighty percent of her scores were in the average range[9]. All of her scores on the accommodated examination were in the average range. Seventy-seven percent of her scores were in the average range on the six prior examinations that were taken under standardized conditions. There was modest improvement in her seventh attempt. But when viewed within the context of her past performance on standardized examinations, the MCAT scores, which are based on a higher standard, are not surprising. And, I would be hard pressed to conclude that these scores demonstrate a pervasive inability to access written examinations due to any reading or processing inefficiencies.

One must consider that factors other than reading and processing abilities might be at play in the applicant's performance on tests and examinations. Her clinical providers have observed that while she works slowly, Ms. Lewis holds perfectionistic standards for her performance, is anxious and insecure about test performance, and has adopted a slow and careful manner in responding to compensate. This mindset can confound the interpretation or meaning of low test scores.

Finally, the fact that Ms. Lewis passed the COMLEX Level 1 examination under standardized testing conditions adds to the evidence that whatever her reading or processing inefficiencies might be, they are not so substantial as to limit her ability to access written examinations.

In the final analysis, while Ms. Lewis and others contend that the laborious and time consuming manner in which she reads and processes information warrants test accommodations, the objective evidence from reading assessments and standardized examinations together show that whatever her reading or processing inefficiencies might actually be, they are not so pronounced as to limit her ability to access written examinations the same as most people in the general population. I cannot recommend providing her with testing accommodations based on the evidence.

---

[9] The MCAT total and subtest scores are included in this calculation.

Joseph E. Bernier, Ph.D.
Licensed Psychologist

JB 0044